## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

STEPHEN Y. LEE,

                                   Plaintiff,

vs.

EQUIFAX INFORMATION
SERVICES, LLC

                                   Defendant.

CASE NO.:

**JURY TRIAL
DEMANDED**

## COMPLAINT

Stephen Y. Lee ("Plaintiff" or "Mr. Lee"), a living, breathing, 29-year-old consumer, brings this Complaint against Equifax Information Services, LLC ("Defendant" or "Equifax") and states as follows:

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring service to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10.     Plaintiff's claims arise out of Equifax's blatantly inaccurate credit reporting, wherein Equifax reported to Plaintiff's potential creditors that he was "deceased" and did not have a credit score.

11.     Accordingly, Plaintiff brings a claim against Equifax for failing to reasonably ensure the maximum possible accuracy of Plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681e(b).

12.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent

violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

13.     Plaintiff Stephen Lee ("Plaintiff" or "Mr. Lee") is a natural person who resides in the Town of Philadelphia, State of Pennsylvania, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14.     Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company authorized to do business in the State of Georgia.

15.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

18.    Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

19.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

20.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

21.    Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

22.    Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

23.     Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

24.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

25.     Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

26.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax credit file, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

27.     Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the

government believes to be deceased. But Defendant does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

28.    Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

29.    Defendant does not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

30.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

31.    Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

32.     Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

33.     Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

34.     Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

35.     Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

36.     Defendant knows that living consumers are routinely turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

37.     Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

38.     Defendant has received and documented many disputes from consumers complaining that their Equifax credit report had them erroneously marked as "deceased."

39.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

40.     Nevertheless, Defendant does not employ any procedures to assure that a consumer marked as "deceased" on their Equifax credit report is, in fact, deceased.

41.     Even consumers who dispute the erroneous "deceased" status on their Equifax credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

42.     Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

43.     Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

44.     For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

45.     Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them— meaning that no one is continuing to purchase reports about that consumer.

46.     Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

47.     Defendant profits from the sale of reports on deceased consumers.

48.     Defendant has in its respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

49.     Defendant knows that truly deceased consumers do not apply for credit.

50.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

51.     Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

52.     Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other

forms of proof, before accessing the deceased consumer's credit information or report.

53.    Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

54.    Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

55.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

56.    Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Mr. Lee Attempts to Obtain Credit Card from Capital One in February 2021**

57.    On or about February 24, 2021, Mr. Lee began looking for different financing options for a credit card.

58.     On February 24, 2021, Mr. Lee submitted an online credit application with Capital One in hopes of being approved for a credit card.

59.     Mr. Lee was prompted to provide his personal identification information, complete a credit application, and provide Capital One with authorization to obtain his credit report(s).

## Capital One Denies Mr. Lee Credit Due to Defendant's Inaccurate Credit Reporting

60.     On or about February 24, 2021, Mr. Lee received an Adverse Action Notice from Capital One, informing him that his credit application had been denied because Defendant had reported him as "DECEASED."

61.     Mr. Lee takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Mr. Lee could not imagine how his credit application had been denied by Capital One.

62.     While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Mr. Lee genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof Capital One needed to override this mistake he could proceed with obtaining financing for the home equity loan he desired. However, Mr. Lee quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Capital

One informed him that it could not move forward with financing given Equifax's information.

**Mr. Lee Disputes Equifax's Inaccurate Credit Reporting in March 2021**

63.    In or about the beginning of March 2021, Mr. Lee placed a telephone call to Equifax to dispute the "deceased" status appearing on his Equifax credit file.

64.    Mr. Lee spent significant time on the phone with various Equifax representatives in an attempt to have his credit report corrected.

**Mr. Lee Disputes with Furnisher Capital One in March 2021**

65.    In or about March 2021, Mr. Lee placed a telephone call to data furnisher, Capital One, to dispute the inaccurate credit information that it had allegedly provided about him to Equifax.

66.    After providing his personal identification information to Capital One's representative, Capital One's representative acknowledged the misreporting error and assured Mr. Lee that Capital One would correct the misinformation and communicate said correction to Equifax within 30 days.

67.    Had Equifax provided Capital One with an accurate credit report for Mr. Lee, he would have qualified for and obtained financing for the credit card he sought, in or about February 2021.

68.    As a result of the "deceased" annotation, Defendant made it practically impossible for Mr. Lee to obtain credit.

69.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

70.     At all times pertinent hereto, the conduct of Defendant, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Mr. Lee herein.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

71.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-70 as if fully stated herein.

72.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

73.     On numerous occasions, Defendant prepared a patently false consumer report concerning Plaintiff.

74.   Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

75.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

76.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; out-of-pocket loss; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

77.   Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

78.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendant negligently and/or willfully violated the
FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as
provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by
the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem
appropriate and just.

## **DEMAND FOR JURY TRIAL**

79.    Plaintiff demands a trial by jury.


Dated:        May 25, 2021

JOSEPH P. MCCLELLAND, LLC

*/s/* Joseph P. McClelland, III
545 N. McDonough Street, Suite 210
Decatur, GA 30030
Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com

*ATTORNEY FOR PLAINTIFF*